Filed 1/31/14  In re M.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.F., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E058931 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ009362) |
| v. | OPINION |
| K.F. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant father.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant mother.

1

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

M.F., the subject of this appeal, was born in 2002 and adopted in 2007 by his great-uncle and his wife, here described as father and mother. The parents have three biological sons (M.F.'s biological cousins) and two other adopted children, who are M.F.'s biological sisters.

Parents separately appeal from an order terminating their parental rights pursuant to Welfare and Institutions Code section 366.26.[1] They join in arguing that the juvenile court's failure to apply the beneficial parental relationship exception to adoption requires reversal. We reject the parents' appeals and affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND

The history of this case began in November 2010 when M.F. was detained from his adoptive parents and placed in foster care. After M.F. was moved to a second foster home, the court took jurisdiction in January 2011. In May 2011, M.F. was relocated to a group home. After the six-month review hearing in October 2011, the parents moved to

_____

[1] All further statutory references are to the Welfare and Institutions Code unless stated otherwise.

Oregon. Between April and July 2012, it was contemplated that M.F. would be returned to Oregon for placement. Reunification services in California were terminated in May 2012. After the Oregon plan collapsed, M.F. was moved to a third foster home for a prospective adoption in October 2012. The parents returned to California but, in November 2012, the court ruled that adoption should be M.F.'s permanent plan. After denying parents' section 388 petitions filed in March 2013, the court terminated parental rights in April 2013.

*A. Detention*

CPS[2] filed an original dependency petition in November 2010 when M.F. was eight years old. The petition alleged the parents' failure to protect (§ 300, subd. (b)) based on mother's neglect and abuse. In particular, mother used inappropriate discipline, isolating M.F. in a locked bedroom, compelling him to use a toddler's training potty, and forcing him to burn his toys as punishment. Mother withheld food. Mother also did not protect M.F. from attacks by one of her sons. Father had failed to intervene. The parents had another open family reunification case involving M.F.'s two sisters.[3]

M.F. and his sisters were dependents of the state of Oregon from 2004 to 2007 until they were adopted by parents in January 2007. In July 2009, M.F.'s sisters were detained by CPS based on substantiated allegations of sexual abuse of the sisters by the

---

[2] Child Protective Services, Department of Public Social Services, County of Riverside.

[3] Case No. E054860.

parents' biological sons.

In September 2010, M.F. had been evaluated by the Department of Mental Health and assessed as having "Bipolar Disorder, severe with psychotic features. He was exhibiting aggressive behavior with siblings and had set fires. He was cruel to animals and threatened his brother with a bat. He has some sexualized behaviors towards his siblings. These behaviors were affecting him at school and at home." He was prescribed medication and behavior modification treatment for ADHD.

The detention report prepared in November 2010 stated that M.F.'s sisters were still in foster care and seemed fearful about returning to the parents. In the past, mother had disciplined them by hitting them, sitting on them so they could not breathe, holding them against the wall and choking them. The sisters confirmed that mother had withheld food from M.F. and restricted him in a bedroom with a motion-sensor alarm and a potty chair When M.F. was confined in the room, he would smear feces on the wall. The sisters called mother a "master manipulator" and a liar who "plays favorites" among the children.

In an interview, M.F. expressed his fear of being hurt by his adoptive brother. He described mother withholding food, locking him in his room with the potty chair for hours, and spanking him. M.F. sobbed and denied being afraid of mother. When mother made him burn his toys as a punishment, someone had called the fire department. Mother was cited for an "illegal burn." The paternal grandmother and great-grandmother expressed concerns about mother isolating the children and mistreating M.F.

4

CPS interviewed mother who identified herself as the primary caregiver because father worked out of town. She did not use corporal punishment but she would restrict the children to their rooms. She stated M.F. had ADHD and she declined to discuss other issues, saying she would contact a lawyer. CPS tried to interview mother with father but they refused to answer questions. After talking to M.F. again, CPS determined to take him into protective custody while he was at school.

The family had prior child welfare history from September 2005 until October 2009, involving poor discipline and physical and sexual abuse. CPS concluded that M.F. was being physically and emotionally abused by mother and his brother. CPS recommended the parents and M.F.'s brothers have supervised visitation with M.F.

On November 18, 2010, the juvenile court found a prima facie case for detention and detained M.F. in foster care with his sisters.

B. *Jurisdiction and Disposition*

CPS prepared a jurisdiction/disposition report in December 2010, recommending M.F. remain in foster care and the parents receive reunification services. CPS detailed more of M.F.'s history. His biological mother had received minimal prenatal care and he was born exposed to methamphetamine and marijuana. He was taking psychotropic medicines for his bipolar disorder. Mother described him as developmentally delayed with difficulty forming attachments and struggling in school. The social worker perceived him as "congenial, cooperative, and fully aware" and "talkative, inquisitive, and . . . eager." In his foster placement with his sisters, M.F. was involved in "continuous

fighting and verbal altercations" with one of his sisters.

In another interview, M.F. confirmed he had been locked in his room with a toddler's potty and forced to burn his toys as a punishment. When mother threatened M.F., father did not intervene  The parents did not stop his brother/cousin from abusing him.

Mother admitted locking M.F. in his bedroom as discipline. She had given him a camping port-a-potty, not a toddler potty, to discourage behaviors like smearing feces on the wall or urinating on the floor. She used security cameras and alarms to monitor his behavior. She denied withholding food. Mother explained that M.F. seemed to be reacting to his sisters being removed. She also mentioned that he had ADHD, causing him to be "hyper and talkative" and to engage in "lying and stealing." He had started a fire in the bathroom by lighting toilet paper. When she discovered him lighting matches, she had burned his toys to teach him a lesson about the consequences of fire. With regard to the brother attacking M.F., she claimed M.F. had incited him. Her biological children were better behaved and more easily disciplined than the adopted children. She had warned M.F. he would lose his toys if he was "taken" by CPS. Mother said that father could not have intervened because he was working in Nevada. She disagreed with the allegation that the parents had not benefited from services in the sisters' dependency case.

Father described mother's treatment of M.F. as being appropriate and necessary. He thought the conflict with the brother was exaggerated. Father insisted mother was "the best parent you'll ever meet" and blamed the adopted children's problems on their

6

history of being exposed to methamphetamine and sexual misconduct. He asserted the children were "safe and loved and respected." Father was highly critical of CPS and the services rendered in the sisters' case.

CPS concluded there was clear and convincing evidence to substantiate the allegations of the dependency petition concerning mother's neglect and abuse, father's failure to intervene, and the parents' other open dependency case involving M.F.'s sisters. CPS recommended dismissing the allegations about M.F.'s brother as unsubstantiated.

CPS prepared an addendum in January 2011 in which it reported that M.F. had been moved to a different foster home, apart from his sisters. M.F. was happy and behaving appropriately although he had stolen a cell phone. Mother had undergone a psychological evaluation and was diagnosed with an adjustment disorder, featuring anxiety, depression, and some histrionic traits. Her relationship with M.F. was particularly stressful. The family had engaged in successful episodes of visitation.

On January 25, 2011, CPS filed an amended dependency petition, alleging mother's failure to protect due to inappropriate parenting skills and striking the other allegations. The court found the allegations of the amended petition were true based on a preponderance of the evidence. M.F. was adjudged a dependent and removed from parents' care. The parents were ordered to have reunification services.

C. *Placement in Group Home*

In May 2011, CPS filed an emergency ex parte application seeking to place M.F. in the "therapeutic structured environment" of a group home. Additionally, CPS had

7

"exhausted all efforts to maintain M.F. in his current school." The foster home had identified M.F.'s "maladaptive behaviors" as including stealing, lying, defiance, sexual misconduct, verbal and physical aggression, refusal to follow directions, hyperactivity, aggravating behavior, and misbehavior with food. On May 26, 2011, the court made an order authorizing placement in a group home.

## D. Contested Six-Month Review Hearing

The contested six-month review hearing was conducted during three days in October 2011. Mother, father, and other witnesses, including M.F.'s older sister testified. M.F.'s sister said she did not want to return to parents' home. Mother waived any future reunification services.

At the end of the hearing, the court terminated the parents' reunification services in the sisters' case and found mother was severely lacking in parenting skills and "created an environment of hostility for all three children and has made very little progress under the case plan." The court maintained M.F. as a dependent child and continued father's reunification services. Visitation for M.F. was ordered to be two hours twice weekly.

## E. The Twelve-Month Status Review

A confusing and somewhat contradictory sequence of events unfolded between April and October 2012. In April 2012, M.F. was still in a group home. The family had moved back to Oregon. Father was working in Bakersfield. He called and visited M.F. about twice a month. M.F. was not behaving well in the group home or school. M.F. was "irritable or volatile" after sporadic contact with parents. Father had completed 12

hours of parenting skills. Mother had not completed parenting classes. CPS concluded the prospect of M.F. returning to his parents was poor but the concurrent plan was for reunification with parents or adoption by his biological paternal grandmother in Oregon. CPS recommended an additional six months of services.

On April 24, 2012, the court ordered an expedited ICPC[4] for the state of Oregon. An addendum prepared by CPS in May 2012 recommended six months more of services. The record reflects that both parents were apparently participating actively in services although mother had waived services and services had been terminated previously.

At the hearing on May 21, 2012, CPS changed its recommendation and asked the court to terminate services and establish a planned permanent living arrangement for M.F. with the goal of returning him home. The trial court found mother's progress was insufficient and terminated reunification services for both parents. The court declined to set a section 366.26 hearing because M.F. was not adoptable and no one would accept legal guardianship. The court set a section 366.3 post-permanency hearing and identified a permanent plan as "returning home."

Oregon denied the ICPC on July 18, 2012, because of the history of the case and the parents' lack of progress. The parents had visited M.F. in California once or twice a month and had taken him out to eat, fishing, and to the movies. In October 2012, the family moved back to Riverside County while father continued to work in Bakersfield.

---

[4] Interstate Compact on the Placement of Children.

9

*F. Post-Permanency Status Review*

In November 2012, CPS reported that M.F. had made significant improvements in his behavior while in the group home. In October 2012, M.F. had moved to another foster home. He was still receiving mood-stabilizing medication. Parents' visitation had been sporadic and, when it occurred, was disturbing to M.F. Although parents wanted him returned to them, prognosis was poor. M.F. liked his foster care and was continuing to improve. He was being assessed for adoption.

On November 29, 2012, the court determined that legal guardianship or adoption was the appropriate permanent plan and set a section 366.26 hearing. The court also reduced parents' supervised visits to once a month.

*G. Section 366.26 and Section 388 Proceedings*

*1. CPS Reports*

In March 2013, CPS recommended parental rights be terminated and M.F. be adopted by his current caregiver with whom he had been placed in October 2012. M.F., age 10, wanted to be adopted but asked not to be present at the hearing because "he fears the same backlash that he saw when his sisters were adopted." M.F. was still taking medication for ADHD and bipolar disorder and had problems with bedwetting and obesity. Nevertheless, M.F. had continued to improve in his foster placement.

Visitation with mother was negative. Mother did not smile or hug or engage with M.F. Visitation with both parents was erratic and often affected M.F. negatively. After an unsuccessful visit in December 2012, M.F.'s therapist recommended visitation be

10

suspended. M.F. significantly improved. M.F. developed a strong bond with the adoptive caregiver, who loved him and sought to provide a "safe, stable, and loving home."

The prospective adoptive father is single, Catholic, and employed as the manager of a golf course. He is stable and committed to providing M.F. with a secure home. He had some minor past criminal offenses, the last one occurring in 1993.

In summarizing, M.F.'s situation, CPS observed "M.F. has an estranged relationship with his parents and he expressed concerns with reunifying with his parents. He stated he does not wish to live with his parents because he fears he will experience the same abuse that he did while he was living with them in the past." He did not want to reunify with them and he wished to be adopted by his current caretaker where he is well cared for and his basic needs are met. He had voluntarily adopted his caretaker's last name and expressed great affection toward him. CPS concluded M.F. was adoptable and recommended that adoption by the prospective father proceed.

In April 2013, CPS filed another addendum recommending the court deny the parents' section 388 petitions. On March 28, 2013, the parents had a four-hour visitation with M.F. at a local restaurant that went well. There was another two-hour visit on April 22, 2013, in which M.F. and his parents played board games and he gave them his cell phone number. The parents used it to call him and pressure him about attending the section 366.26 hearing.

*2. Parents' Section 388 Petitions*

Both parents filed section 388 petitions seeking to vacate the section 366.26 hearing and to obtain family maintenance or reunification services. Father had completed a parenting course in October 2011. Mother had completed a parenting course in April 2012. The family had 16 therapy sessions between November 2012 and March 2013. Both parents attested to their bond with M.F. and their ability to provide him with a stable home and financial support.

*3. The Section 366.26 and Section 388 Hearings*

A lengthy hearing transpired on April 25, 2013. Both parents testified they had moved to Oregon to facilitate M.F.'s return. The parents' private therapist testified that the parents were remorseful and he viewed the family's interactions as safe, loving, and nurturing. He observed M.F. to be exuberant and loving toward parents.

Mother testified that it took a while to bond with M.F. after he began living with the family in 2005. In 2010, he began to behave badly. Mother recognized that locking M.F. in a bedroom and burning his toys was inappropriate. In August 2012, the parents had unsupervised visitation that was "wonderful." In September 2012, the family moved back to Riverside County to participate in counseling. CPS denied visitation in October and November 2012 but the December 2012 visit was "great." The visits were also good in March and April 2013.

Father testified that he lived in Oregon and worked in Bakersfield between June and August 2012. He visited M.F. twice a month and then weekly.

12

No visits occurred in September, October, and November 2012 and January and February 2013. The visits in December 2012 and March and April 2013 were positive.

The CPS social worker testified that he had worked on the case in 2012 and 2013. Mother had completed parenting classes and counseling. The family had been offered family counseling. No visit happened in October 2012 because M.F. was moving into his foster home. The parents visited M.F. in November and December 2012. M.F.'s therapist recommended no visits after December 2012 because M.F. was acting aggressively.

M.F. testified in chambers that he was glad to see the parents and missed them but did not want to "go through this all again." He enjoyed their visits and shared a bond with them but he was happy with his foster dad and felt safe with him. He had mixed feelings and would feel sad if he was adopted but he would be protected against possible harm. He loved the parents but he believed it would be better to be adopted.

At the end of the hearing, the court denied the section 388 petitions, finding there was no change of circumstances and it was not in the best interests of the minor. The court called the case a tragedy in part because the parents had moved to Oregon and sabotaged themselves.

The court decided M.F. was likely to be adopted and that no exception applied. The court terminated the parental rights.

*H.  Section 366.3 Post-Permanent Plan Status Review Report*

In May 2013, CPS reported M.F. was feeling safe and protected, living with his

13

foster father. He was having phone contact with his sisters. He was a "strong candidate" for adoption.

## III

## SECTION 366.26, SUBDIVISION (c)(1)(B)(i)

Both parents argue the beneficial parental relationship applies. We affirm the trial court's finding the exception does not apply because the parents cannot show they maintained regular visitation and cannot demonstrate a credible benefit or corresponding detriment to M.F. would be caused by severing their relationship. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343, 1345.)

Adoption is the preferred permanent plan for a dependent child once family reunification efforts have proven unsuccessful. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) Section 366.26 provides that, once the juvenile court determines that a dependent child is likely to be adopted, it shall terminate parental rights unless one of the seven enumerated exceptions to adoption applies. (§ 366.26, subd. (c)(1).) Section 366.26, subdivision (c)(1)(B)(i), provides the preference for adoption is overcome, and another permanent plan should be selected, where the parents establish they have maintained regular visitation and contact with the child, the child would benefit from continuing that relationship, and terminating the relationship would cause the child to suffer detriment. (*In re S.B.* (2008) 164 Cal.App.4th 289, 300-301.)

14

The applicability of the exceptions to adoption is reviewed under a hybrid substantial evidence and abuse of discretion standard. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The questions for the reviewing court are "whether the evidence compels a finding in favor of the appellant as a matter of law" as to the factual questions of whether the parents maintained regular visitation with the child, whether a beneficial parent-child relationship exists, and whether the juvenile court's application of the law to the facts was arbitrary or capricious. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; *In re C.B.* (2010) 190 Cal.App.4th 102, 123.) The benefit exception is "almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5.)

In order to establish the element of "regular visitation," a parent must show more than "frequent and loving" or "pleasant" contact. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) Sporadic visitation is not enough. (*Ibid.*; *In re C.F.* (2011) 193 Cal.App.4th 549, 554.) Furthermore, the benefit to the child must outweigh the value of a permanent adoptive home. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.)

Between November 2010 and December 2012, the visitation between M.F. and parents was inconsistent and frequently negative. When the family moved to Oregon after October 2011, mother visited M.F. only once during a reporting period and father came twice a month from his job in Bakersfield. Their phone communication often was not successful. M.F. behaved negatively after contact with the parents. After May 2012,

15

parents visited only once a month and M.F. responded to visits by being depressed and upset. In December 2012, M.F. became very angry and aggressive.[5] The March and April 2013 visits occurred without incident but parents behaved inappropriately by pressuring M.F. about the upcoming hearing. In summary, the visitation for two and a half years did not qualify as "regular visitation" for purposes of the adoption exception.

Furthermore, the benefit and corresponding detriment to M.F. cannot be said to outweigh the value of a permanent home. In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, the Court of Appeal described the beneficial parent-child relationship as the significant attachment from child to parents that results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection, stimulation, companionship and shared experiences. The four factors to be considered in determining whether the parent occupies a parental role in the child's life are "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs[.]" (*Id.* at p. 576; *In re S.B., supra*, 164 Cal.App.4th at p. 299; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

There is only slight evidence that parents attended to M.F.'s needs for physical care, nourishment, comfort, affection, stimulation, companionship, and shared

---

[5] We recognize CPS should not have suspended visits in January and February 2013.

experiences, and occupied a true parental role in M.F.'s life.  Instead, the record shows that M.F. was severely traumatized while in parents' care.  After a year and a half in a group home and six months in his foster/adoptive placement, he improved dramatically. He was very attached to his foster father and felt safe and loved.

At age 10, M.F. testified that he did not want to reunify with parents and return to the life he had experienced with them.  In spite of his continued affection for parents, he preferred to be adopted.  The juvenile court did not abuse its discretion when it found the benefits of adoption outweighed any detriment caused to M.F. by termination of parental rights.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)

IV

DISPOSITION

The parents did not establish the beneficial parental relationship exception to adoption.  We affirm the findings and orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


RAMIREZ

P. J.


KING

J.